**ANTONIA M. APPS**
**REGIONAL DIRECTOR**
**Tejal D. Shah**
**Judith Weinstock**
**Todd Brody**
**Kim Han**
**Kevin Osowski**
**Attorneys for Plaintiff**
**SECURITIES AND EXCHANGE COMMISSION**
**New York Regional Office**
**100 Pearl Street**
**Suite 20-100**
**New York, NY 10004-2616**
**212-336-0080 (Brody)**
**brodyt@sec.gov**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                    Plaintiff,<br><br>          -against-<br><br>**MICHAEL BRACKETT,**<br><br>                    Defendant. | **COMPLAINT**<br><br>24 Civ. 2965 (    )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendant Michael Brackett ("Brackett"), alleges as follows:

## SUMMARY

1.      This case involves a $2.8 million offering fraud scheme in the securities of Centricity, Inc., a start-up technology company, perpetrated by Centricity's Chief Executive Officer ("CEO") and founder, Michael Brackett. Brackett perpetrated a scheme to defraud investors and prospective investors in two rounds of investments by making material misrepresentations about the existence of Centricity's customers, Centricity's revenue, and Brackett's educational and employment background, as well as by misappropriating investor funds.

2.      From approximately July 2019 through June 2021 (the "Relevant Period") Brackett repeatedly informed prospective investors that Centricity had contracts with several large national companies and claimed that Centricity's revenue was several million dollars. In fact, nearly all of these contracts did not exist and there is no evidence that Centricity even had any contact with most of these companies. Moreover, contrary to his representations, Centricity had no revenue in 2020 and less than $60,000 of revenue in 2021. Brackett's representations that he graduated from college, had an MBA degree, and managed a $650 million dairy portfolio at his prior employer, were also false. To date, investors have not received their money back.

## VIOLATIONS

3.      By virtue of the foregoing conduct and as alleged further herein, Defendant Brackett violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77q(a)], and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

4.      Unless the Defendant is restrained and enjoined, he will again engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

5.      The Commission brings this action pursuant to the authority conferred upon it by Securities Act Sections 20(b) and 20(d) [15 U.S.C. §§ 77t(b) and 77t(d)], and Exchange Act Section 21(d) [15 U.S.C. § 78u(d)].

6.      The Commission seeks a final judgment: (a) permanently enjoining the Defendant from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering the Defendant to disgorge all ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon, pursuant to Exchange Act Sections 21(d)(5),

2

and 21(d)(7) [15 U.S.C. §§ 78u(d)(5), and 78u(d)(7)]; (c) ordering the Defendant to pay civil money penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)], Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)]; (d) permanently prohibiting the Defendant from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this action pursuant to Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa].

8. Brackett, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

9. Venue lies in this District under Securities Act Section 22(a) [15 U.S.C. § 77v(a)] and Exchange Act Section 27 [15 U.S.C. § 78aa]. During the Relevant Period, certain acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District. Among other things, during the Relevant Period, Brackett resided and transacted business in Manhattan. Defendant also made material misrepresentations to at least one investor located in Manhattan.

## DEFENDANT

10. Brackett, age 36, founded Centricity in 2019 and was its CEO until his resignation in June 2021. During the Relevant Period, Brackett resided in New York City. Following his resignation as Centricity CEO, Brackett moved to Zurich, Switzerland where he had a residence and a work visa.

11. On or about August 15, 2023, Brackett was arrested in Maine while visiting his family in the United States and was charged with one count of securities fraud and one count of wire fraud in connection with sending a falsified customer list with grossly inflated revenue numbers to persuade a victim to invest $500,000 in Centricity. The criminal case against Brackett is captioned *United States v. Brackett*, 23-cr-392 (SDNY) (JGK) (the "parallel criminal action").

12. As a condition of his pretrial release in the parallel criminal action, Brackett surrendered his passport and his travel was limited to the continental United States. In January 2024, Brackett failed to appear at a probation meeting. Brackett also failed to show up at his most recent status conference in the parallel criminal action and a bench warrant was issued for his arrest. Brackett recently informed the U.S. Marshals Service that he is no longer in the United States. As such, Brackett is evading criminal prosecution and should be considered a fugitive.

### RELEVANT ENTITY

13. **Centricity, Inc.** is a Delaware corporation formed by Brackett in 2019 with its principal place of business in New York, New York. Centricity ceased operations in June 2021, but was not formally dissolved at the time. Brackett served as the company's CEO from at least July 2019 through June 2021 when he resigned and the company ceased operations.

### FACTS

**I.   BACKGROUND**

14. Centricity was a start-up technology company that purported to use artificial intelligence to analyze hundreds of millions of internet searches daily to provide companies with information about consumer demand in specific geographic areas.

15. Start-up companies like Centricity typically raise capital through "rounds" or "series" of external funding, through which investors provide funding to the company in exchange for equity at specific valuation. The first round of financing is often referred to as the "seed" round. When a

4

start-up company has shown sufficient progress in building its business model and has the potential to generate revenue and grow, a "Series A" round of financing typically occurs.

16. As CEO of Centricity, Brackett raised approximately $2.8 million for Centricity from seven investors in a completed seed round and an incipient Series A round.

## II. BRACKETT MAKES REPEATED MATERIAL MISREPRESENTATIONS TO INVESTORS WHILE SOLICITING THEIR INVESTMENTS

### A. Brackett Raises $2.13 million in the Centricity Seed Round

17. In June 2019, Brackett approached Investor 1, a venture capital firm that invests in early-stage business software companies, about investing in Centricity's seed round.

18. In discussions and written communications with Investor 1 about investing in Centricity's seed round, Brackett represented that Stop & Shop and Chobani had both committed to using Centricity's services at a rate of $100,000 each.

19. In fact, Brackett had no contact with Stop & Shop or Chobani about Centricity and neither had committed to trying Centricity's services, let alone paying $100,000 to do so.

20. Brackett also made representations to Investor 1 about his background, including that he held an undergraduate degree and an MBA degree from the University of Southern Maine and that he had managed a $650 million annualized dairy portfolio while employed by Ahold Delhaize, a multinational company that owns multiple supermarket chains in the United States.

21. These representations were also false. Brackett did not have a college degree, much less an MBA degree, and Brackett never managed a $650 million dairy portfolio.

22. Brackett knew, or recklessly disregarded, that these representations were false.

23. Based on these representations, in August 2019, Investor 1 invested approximately $1.5 million in Centricity's seed round in exchange for an equity stake in Centricity.

24. In addition to investing, Investor 1 also introduced Brackett to other potential investors, to whom Brackett made similar representations as he had made to Investor 1.

5

25. Five of the potential investors that Investor 1 introduced to Brackett ultimately signed stock purchase agreements with Centricity.

26. Based on Brackett's misrepresentations about his background and Centricity's customers, between August and the end of December 2019, these five investors (Investor 2, Investor 3, Investor 4, Investor 5, and Investor 6) also invested, bringing the total amount raised during Centricity's seed round to $2.13 million.

**B.     Brackett Raises an Additional $700,000 in a Series A Round**

27. Less than six months after completing Centricity's seed round, Brackett began soliciting investors for a $13 million Series A round.

28. Between May 2020 and June 2021, Brackett made repeated misrepresentations about Centricity's revenue and customers to the investors in Centricity's seed round (in anticipation that they would also invest in the Series A round) as well as to other potential Series A investors.

29. These misrepresentations vastly overstated Centricity's revenue and also falsely stated that Centricity had contracts with various well-known companies.

30. In fact, Centricity had no revenue in 2020.

31. In 2021, Centricity generated less than $60,000 in revenue from two customers.

32. The vast majority of the purported customer contracts touted by Brackett did not exist and there is no evidence that Brackett or Centricity had any contact with these companies.

33. As CEO of Centricity, Brackett knew, or recklessly disregarded that, these representations were false.

34. For example, on May 23, 2020, Brackett emailed Investor 2 and Investor 6, representing that Centricity had signed contracts with five well-known companies—including L'Oreal, Kraft Heinz, and Kind Bar—each representing $150,000 of revenue for a total of $750,000.

6

35. Centricity had no contracts with L'Oreal, Kraft Heinz, or Kind Bar and there is no evidence that Centricity or Brackett had any contact with these companies.

36. On or around August 29, 2020, Brackett sent an "End of Quarter" update to the seed investors, including Investors 3, 4, 5, and 6, representing that Centricity had signed several well-known companies as clients, and was on track for 2020 revenue of above $2.7 million.

37. On November 4, 2020, Brackett sent Potential Investor 1 a list of "Centricity's 2020 Revenue by Customer." This document listed 10 customers and provided a dollar amount next to each customer, which purported to represent an annual contract value for that customer. The list showed 2020 total revenue of $3 million from the 10 customers, including Pepsi and Walmart.

38. Centricity had no contracts with either Pepsi or Walmart and there is no evidence that Centricity or Brackett had any contact with these companies.

39. Brackett subsequently identified Potential Investor 2, a multibillion-dollar venture capital and private equity firm, as a potential lead investor for the Series A round.

40. On February 15, 2021, Brackett sent Potential Investor 2 a list of 11 purported Centricity customers.

41. On March 25, 2021, Brackett sent Potential Investor 2 an email claiming that Centricity had annual recurring revenue of $4.5 million and had recently signed a contract with a major clothing retail company.

42. As part of its pre-investment diligence, Potential Investor 2 informed Brackett that they wanted to speak with several of Centricity's clients.

43. On March 31, 2021, Brackett introduced Potential Investor 2, through email, to a purported Walmart employee. And on April 19, Brackett introduced Potential Investor 2, through email, to a purported Pepsi employee.

44. Both supposed customer contacts provided glowing reviews about Centricity. However, neither of these emails were authentic; they appear to have been created by Brackett (or at his direction) using false email domain addresses for the two companies.

45. On or around March 26, 2021, Brackett emailed Investor 2 and Investor 4, that Potential Investor 2 had agreed to be the lead investor in the Series A investment round, even though Potential Investor 2 had not made that commitment.

46. On May 9, 2021, Potential Investor 2 informed Brackett that it was not going to be the lead investor for the Series A round. Brackett did not inform Investor 2 and Investor 4 that Potential Investor A declined to invest any money much less serve as the lead investor.

47. On April 22, 2021, Brackett sent Investor 2 two slide decks. One slide deck claimed Centricity had $3.8 million in revenue for "YE '20 (10 months selling)" and the other slide deck claimed Centricity had $4.5m in revenue after "11 months selling."

48. Based on these representations, on May 28, 2021, Investor 2 invested an additional $200,000 in Centricity in the form of a promissory note convertible into Centricity stock.

49. On June 2, 2021, Brackett sent another venture capital firm, Investor 7, a slide deck that claimed Centricity had $4.5m in revenue after "11 months selling" and a financial model showing Centricity's revenue, including hundreds of thousands of licensing revenue in the months preceding June 2021.

50. On June 4, 2021, Brackett sent Investor 7 a spreadsheet of purported current customers of Centricity, which included Pepsi and Walmart, among others. The spreadsheet also included the purported monthly revenue purportedly generated from each of the purported customers between April 2020 and April 2021. The combined yearly revenue for all the companies totaled over $3.7 million. Based on these representations, on June 18, 2021, Investor 7 invested $500,000 in the form of a promissory note convertible to Centricity stock.

### III. BRACKETT MISAPPROPRIATED INVESTOR FUNDS

51. Brackett represented to investors that their investments in Centricity would be used for, among other things, developing Centricity technology and hiring engineering and sales staff.

52. Brackett did not disclose to investors that he would use investor funds for personal expenses.

53. Between August 2019 and June 2021, Brackett misappropriated more than $250,000 to directly fund his personal expenses, including spending more than $125,000 on an apartment with a sauna; more than $14,500 on car payments for his Tesla; more than $12,000 on gym memberships and fitness classes; and over $66,000 toward charges on his personal credit card. Additionally, Brackett used investor funds to repay debts that he incurred prior to Centricity's founding, including more than $2,200 on a personal loan and more than $5,000 in personal credit card debt.

**FIRST CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

54. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 3 and 8 through 53.

55. Brackett, directly or indirectly, singly or in concert, in the offer or sale of securities and by the use of the means or instruments of transportation or communication in interstate commerce or the mails, (1) knowingly or recklessly has employed one or more devices, schemes or artifices to defraud, (2) knowingly, recklessly, or negligently has obtained money or property by means of one or more untrue statements of a material fact or omissions of a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (3) knowingly, recklessly, or negligently has engaged in one or more transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

56. By reason of the foregoing, Brackett, directly or indirectly, singly or in concert, has violated and, unless enjoined, will again violate Securities Act Section 17(a) [15 U.S.C. § 77q(a)].

## SECOND CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder

57. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 3 and 8 through 53.

58. Brackett, directly or indirectly, singly or in concert, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

59. By reason of the foregoing, Brackett, directly or indirectly, singly or in concert, have violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Permanently enjoining Brackett and his agents, servants, employees and attorneys and all persons in active concert or participation with him from violating, directly or indirectly, Securities

Act Sections 17(a)(2) [15 U.S.C. §§ 77q(a)(2)], Exchange Act Sections 10(b) [15 U.S.C. §§ 78j(b)], and Rules 10b-5(b) thereunder [17 C.F.R. §§ 240.10b-5(b)].

## II.

Ordering Brackett to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations, pursuant to Exchange Act Sections 21(d)(3), 21(d)(5), and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5), and 78u(d)(7)];

## IV.

Ordering Brackett to pay civil monetary penalties under Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)];

## V.

Permanently prohibiting Brackett from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)];

## VI.

Granting any other and further relief this Court may deem just and proper.

## JURY DEMAND

The Commission demands a trial by jury.

Dated: New York, New York
April 19, 2024

     /s/ Antonia M. Apps
ANTONIA M. APPS
REGIONAL DIRECTOR
Tejal D. Shah
Judith Weinstock
Todd Brody
Kim Han
Kevin Osowski
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street
Suite 20-100
New York, NY 10004-2616
212-336-0080 (Brody)
brodyt@sec.gov